**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RONALD DUNBAR | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17 C 6278 |
| | ) | |
| v. | ) | |
| | ) | |
| NANCY BERRYHILL, | ) | Magistrate Judge Daniel G. Martin |
| Acting Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald Dunbar ("Plaintiff" or "Dunbar") seeks judicial review of a final decision of Defendant Nancy Berryhill, the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability insurance benefits and supplemental security income benefits in an August 31, 2016 written decision of an Administrative Law Judge ("ALJ"). Dunbar appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross-motion.

The Court has carefully reviewed the administrative record but omits a detailed description of it except as necessary to address the parties' primary concerns. The record consists largely of progress notes related to two conditions. Dunbar experienced encephalitis in 2008 and was successfully treated for his condition. Dunbar was also treated with medication and, later, with psychotherapy for diagnoses of depression and anxiety. Dunbar filed for Disability Widower's Benefits on April 8, 2014, alleging an onset date of April 15, 2008. At the administrative hearing, his attorney told the ALJ that the date

should be amended to November 1, 2012, though the ALJ did not do so in his decision. For the reasons discussed below, Plaintiff's motion is granted, and the Commissioner's motion is denied.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. See 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(I). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20

2

C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

B. **Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."

*Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### C. The ALJ's Decision

The ALJ applied the familiar five-step analysis to find at Step One that Dunbar had not engaged in substantial gainful activity since his alleged onset date. His severe impairments at Step Two were herpes encephalitis/menngoencephalitis, right rotator cuff syndrom, anxiety disorder, and an affective disorder. None of these impairments met or equaled a listing at Step Three, either singly or in combination. Before moving to Step Four, the ALJ considered Dunbar's allegations concerning the severity and frequency of his impairments. The ALJ found that they were "not entirely consistent with the medical evidence and other evidence in the record." (R. 24). The ALJ also formulated an RFC for Plaintiff. The ALJ found that Dunbar could carry out medium work with various exertional and non-exertional restrictions. Those restrictions addressed both Dunbar's physical and mental impairments. The ALJ accounted for the latter by stating that Plaintiff "can perform simple and routine tasks. He can have occasional interaction with supervisors, coworkers, and the public." (R. 23). The ALJ then found at Step Four that Dunbar was not able to perform his past relevant work. Relying on the testimony of a Vocational Expert, the ALJ found at Step Five that jobs existed in the national economy that an individual with Dunbar's RFC could perform. He therefore concluded that Plaintiff was not disabled.

## II. Discussion

Dunbar argues that the ALJ erred on two grounds. He first claims on multiple fronts that the ALJ's evaluation of his subjective symptoms was inadequate. Second, Dunbar claims that substantial evidence does not support the RFC finding. The Court addresses each issue in turn.

1.  **The Symptom Evaluation**

A court gives significant deference to an ALJ's analysis of a claimant's statements concerning the severity and frequency of his symptoms. *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (noting that an ALJ's finding should be reversed only when it is "patently wrong"). Social Security Ruling 16-3p, which applies here, explains that in addition to the objective medical record, an ALJ must consider a claimant's daily activities, the frequency of his symptoms, precipitating factors, medications, non-medication treatment, attempts to relieve the symptoms, and any other factors that may be relevant. SSR 16-3p. An ALJ must articulate "specific reasons" for his or her findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). *See also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record").

Dunbar first challenges the legal standard that the ALJ used in evaluating his symptoms. Using boilerplate language, the ALJ stated that Dunbar's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 23). Dunbar points out that the SSA's regulations state that when an ALJ determines if a claimant is disabled, the ALJ considers whether "all your symptoms, including pain, and the extent to which your symptoms can reasonably be

accepted as consistent with the objective medical evidence, and other evidence." 20 C.F.R. § 416.1529(a). A claimant's testimony is part of the "other evidence" in this guideline. The ALJ considers a claimant's statements, together with other evidence, to decide "the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence[.]" *Id*. Dunbar claims that the regulations' use of "reasonably" sets a lower legal bar than the one the ALJ used when he discounted Dunbar's statements because they were "not entirely consistent" with the record. Dunbar also claims that the ALJ's standard is insufficient because it fails to specify what evidence the ALJ thought was inconsistent with Dunbar's testimony. *See Dejohnette v. Berryhill*, 2018 WL 521589, at *5 (N.D. Ill. Jan. 22, 2018) ("'Not entirely consistent' is an opaque phrase that fails to specify what evidence the ALJ considered and what evidence she considered inconsistent with the record").

Dunbar's claim represents a new line of attack on the boilerplate language that ALJs now use to assess a claimant's statements about his or her symptoms. Shortly after Dunbar filed his motion in this case, his counsel persuaded Magistrate Judge Cole that when an ALJ finds that a claimant's testimony is "not entirely consistent" with the record, the ALJ erroneously applies a more rigorous standard than the regulations permit. *Minger v. Berryhill*, 307 F. Supp.3d 805, 871 (N.D. Ill. 2018) (stating that the standard set out in the regulations "is clearly a different, and a not as rigorous, a standard than the ALJ's demanded in this case"); *see also Farley v. Berryhill*, — F. Supp.3d —, 2018 WL 2426905, at *3 (N.D. Ill., May 30, 2018) (Cole, M.J.). Dunbar's concerns are easy to understand. Assuming for the sake of argument that the consistency between a claimant's statements

6

and the record could be quantified (which, of course, is not really possible), an ALJ could find that the claimant's testimony is, say, 90 percent consistent with the evidence. That would almost certainly satisfy the regulations' requirement that statements "can reasonably be accepted as consistent" with the record – and still be faulted, as it was in this case, for being "not entirely consistent" with the evidence.

The Commissioner's response to this argument is puzzling. The government first claims, or at least implies, that the ALJ did not really mean what he said. According to the Commissioner, the ALJ's standard does not require Dunbar's assertions to be "consistent with *every piece* of evidence in the record." (Doc. 31 at 2- 3). It is difficult, however, to understand why that is the case. Faulting testimony because it is "not entirely consistent" with the record plainly implies that, in order to be acceptable, it *should* be "entirely consistent" with all of the evidence. The ALJ may have meant what the Commissioner says he did, but it is certainly not what he stated. Nor does the Commissioner explain what else it was that the ALJ had in mind when he evaluated Dunbar's statements. The Commissioner claims that the ALJ went on to find that Dunbar's claims were undermined by inconsistencies with the record. But that is also difficult to understand because the ALJ never directly identified any conflict between the evidence and Dunbar's statements. It is true that the ALJ reviewed the medical record in some detail. Merely summarizing the record, however, is not the same as analyzing it and allowing a court to follow the basis of the ALJ's reasoning. *See Dejohnette*, 2018 WL 521589, at *5 ("Without more, effective review is difficult or even impossible" under the standard used by the ALJ). By not linking the record to Dunbar's testimony the ALJ never engaged in the necessary task of building a logical bridge between the record and the ALJ's conclusion. *See, e.g.*, *Larson v. Colvin*,

7

26 F. Supp.3d 798, 811 (N.D. Ill. 2014) ("He could not simply summarize the evidence and say it didn't support Mr. Larson's allegations. Just as an expert's *ipse dixit* is not acceptable . . . neither is an ALJ's. That is the whole point of the logical bridge requirement.").

The Commissioner goes on to claim that the ALJ's standard is not all that problematic because courts are required to give significant deference to an ALJ's consideration of a claimant's symptoms. Courts should always defer to an ALJ's evaluation of a claimant's symptoms when that finding is not clearly incorrect. *See Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). Dunbar's claim, however, is that the ALJ applied an incorrect legal standard. That precludes the Commissioner's position because courts give no deference to decisions based on the wrong standard. *See Dominguese v. Massanari*, 172 F. Supp.2d 1087, 1094-95 ("[I]f the ALJ commits an error of law such as incorrectly applying legal standards, reversal is required without regard to the volume of evidence in support of the factual findings."). The Commissioner also argues that the ALJ's analysis is correct because the evidence as a whole supports it. That overlooks that the subsequent analysis cannot rescue a decision if the ALJ applies an incorrect legal standard.[1] *Dominguese*, 172 F. Supp.2d at 1094-95.

---

[1] Judge Cole made that point in *Minger*. Under the previous boilerplate language that ALJs used in credibility analyses, the claimant's statements were often found to be non-credible to the extent that they were inconsistent with the RFC finding. That language was severely criticized for years. Remand was not necessary in such cases if the ALJ went on to properly discuss how the record supported her assessment. But the former boilerplate language did not involve the application of an incorrect *legal* standard; it merely implied, erroneously, that an ALJ assessed the RFC before considering the claimant's symptoms. If the ALJ uses the wrong legal standard, "the discussion following the boilerplate doesn't rescue the opinion, because the ALJ might be applying the wrong standard in that discussion." *Minger*, 307 F. Supp.3d at 872.

That said, the Court declines to consider whether the ALJ's use of the "not entirely consistent" standard is legally correct or not. Other than claiming that the ALJ meant something different than what he said, the Commissioner's only response to Dunbar's argument is that it constitutes a "red herring" that should be rejected.[2] (Doc. 31 at 3). Stating that a party's argument is misleading is not the same as explaining why it is incorrect. Indeed, the government does not claim that the ALJ's standard *is* legally correct. Nor does the Commissioner discuss the regulations that Dunbar cites or address *Minger*, *Farley*, or *Dejohnette*, all of which had been issued by the time the Commissioner filed her response. Thus, insofar as the Commissioner even addresses the issue, it amounts to a skeletal claim that cannot be meaningfully considered. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (stating that arguments are waived when "underdeveloped, conclusory, or unsupported by law"); *White v. Colvin*, 2015 WL 1969636, at *2 n.2 (S.D. Ind. May 1, 2015) ("The Court will note address such skeletal arguments."). The government's decision not to address Plaintiff's claim in more than a perfunctory manner waives the issue for the purpose of this case. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motors Express*, 181 F.3d 799, 808 (7th Cir. 1999) ("A party's failure to meaningfully respond to a motion for summary judgment . . .

---

[2] The Commissioner also points to *Reed v. Colvin*, 656 F.App'x. 781 (7th Cir. 2016) as an example in which the Seventh Circuit affirmed an ALJ's symptom analysis even though the ALJ used the "not entirely consistent" standard. That overlooks that the legal sufficiency of the ALJ's standard was not at issue in *Reed*.

9

constitutes waiver.").[3]

Even if the Commissioner had shown that the ALJ's standard is proper, the symptom evaluation would still fail because it is difficult to determine what part of Dunbar's testimony the ALJ thought was "not entirely consistent" with the record. Dunbar's activities of daily living ("ADLs") illustrate the problem. Plaintiff said little on this topic at the hearing, in part, because the ALJ never inquired into his ADLs or the limitations that Dunbar's physical and mental impairments had on his ability to work. An ALJ has a duty to develop a full and fair record. "It would certainly seem that this obligation ought to include asking a claimant what's wrong with her or how she feels or what she able [sic] to do around the house." *Bancolita v. Berryhill*, 312 F. Supp.3d 737, 741 (N.D. Ill. 2018). Here the ALJ's questions for Dunbar fill eight pages out of a 48-page transcript and asked none of these things. The ALJ only inquired in passing what took place at one of Dunbar's work sites; he otherwise restricted his brief questioning to Dunbar's past relevant work. (R. 67-75).

That does not mean that the ALJ had nothing to go on. Dunbar's attorney elicited testimony on some of the issues relevant to Plaintiff's daily activities and limitations. The ALJ, however, did not take note of anything that Dunbar said on the topic, stating in broad terms that Plaintiff "testified that he does household chores." (R. 22). Such a generic statement explains little or nothing about what it was that the ALJ thought enabled Dunbar

---

[3] Judge Cole criticized the Commissioner in *Minger* for relying on the "not entirely consistent" standard to defend the ALJ's decision in that case. *Minger*, 307 F. Supp.3d at 872 ("That is a foolish tactic and generally a fatal one."). The Commissioner has abandoned that line of argument in this case but does not take the next step to address the issue head on. This topic will almost certainly linger in disability cases until the matter is discussed more frequently by courts or is given definitive consideration on appeal. The Court stresses that it makes no finding on the merits of Plaintiff's claim.

to work full time. The ALJ was obligated to describe more carefully what those activities involved. His only approach to the issue was to quote *verbatim* a non-specific remark that examining psychiatrist Dr. Piyush Buch included in his report on Dunbar: Plaintiff told him that he cooked, cleaned, dusted, washed dishes, went shopping, and did laundry. (R. 22, 702). These, too, fail to illuminate what it was that the ALJ thought was critical to Dunbar's claims about his symptoms. "There is no requirement in social security law that a person be unable to feed, groom, bath [sic] or dress herself in order to be disabled. Nor does the ability to perform some basic household tasks mean that a person is not disabled." *Wates v. Barnhart*, 274 F. Supp.2d 1024, 1039 (E.D. Wis. 2003). *See also Punzio v. Astrue*, 630 F.3d 704,712 (7th Cir. 2011) (explaining that a claimant's "ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace").

An ALJ is required to "competently explain" why a claimant's statements are not accepted by citing "specific reasons supported by the record." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (internal quotes omitted). In order to do that, the ALJ needed to move beyond broad statements and at least take some notice of the degree of effort that Dunbar put into these activities. The ALJ never did so because he also overlooked the second source of information on daily activities – Dunbar's written ADL reports. Plaintiff claimed in December 2010 that cooking only involved ten minutes to prepare cereal, toast, or sandwiches. (R. 257). He does household chores twice a week. (R. 257). By 2014, those activities were even more limited. Dunbar stated at that time that he only did four household chores each week and did each task for one hour. (R. 329). Walking one mile required him to rest for ten minutes, and Dunbar became confused and panicky when trying

11

to follow written instructions. (R. 331). Dunbar's daughter was even more specific in her written report, stating that "he only eats tuna from a can w/crackers" and gets "nervous" when he cleans the house and needs to rest until his heart stops racing. (R. 292-93). By overlooking what Dunbar stated about his ADLs, the ALJ necessarily failed to explain how the record was inconsistent with those activities. That, in turn, does not address how a person who says he can only do household tasks for four hours each week can carry out a full-time job for 40 hours each week. Indeed, Dunbar's description of his household chores does not even constitute "daily" activity. As for those relatively minimal things that he did every day such as bathe, dress himself, and prepare simple meals, the ALJ never discussed why that meant that Dunbar could work on a full-time basis. (R. 22).

      The ALJ did take some notice of Dunbar's testimony that he worked, or at least tried to work, at various times during his alleged disability period. For example, the ALJ used his work efforts as a reason to give great weight to the expert medical reports, even though the ALJ never drew any connection between what Dunbar described and what the experts said that he could do. (R. 28). This raises the same problem as Dunbar's ADLs: what work was he actually doing? The ALJ only briefly touched on this issue. He cited notes from Dunbar's psychological interviews stating that Plaintiff was working "some side jobs" in October 2012. The ALJ did not identify what those jobs were, what Dunbar did, or how they showed that he could work full time. The ALJ also said that Dunbar worked "as a driver for his brother's company, delivering mulch and firewood" in June 2013. However, that seriously distorts what Dunbar said. He told the ALJ at the hearing that his work for his brother's landscaping business involved very little activity. He worked two to three times a week in 2014, though there were periods when he could not leave his house at all.

12

Even then, the work consisted only of "[m]inor stuff, it's from sweeping, you know, I'm pushing a broom." (R. 62). As for the ALJ's claim that Dunbar was involved in more onerous physical duties like driving and delivering mulch and firewood, Plaintiff clearly told the ALJ that he never performed such tasks. (R. 62, "I don't deliver. I ride along.").

Having misconstrued this portion of Dunbar's testimony, the ALJ went on to state that Dunbar told his treating physician "that he tried to start a new job, but could not handle it, as he was too anxious to calculate simple math and got lost in the store several times." (R. 27). Not only did Dunbar tell this to his doctor, he told it to the ALJ at the hearing. He stated: "I've tried to go to different jobs, and then when I get there I just go into this panic mode and I just, I can't explain it. I can't get out of it." (R. 62). Dunbar explained that he attempted to train for a position at Cabela's Wholesale but became seriously confused after one week. "I was completely lost. I didn't know where I was. I had people coming up saying hello to me that I spent the whole day with the day before, and I didn't know them. . . . I ended it. I just went up to the lady and said I can't do this anymore. I just – I couldn't handle it." (R. 72).

This startling testimony was critical to the ALJ's decision because it goes to the heart of Dunbar's claim that his emotional impairments prevent him from working on a sustained basis. Yet the ALJ overlooked Dunbar's testimony and never addressed how he would be able to work full time in light of what he told his treating physician. More evidence existed on the topic. Dunbar testified that he moved to Florida at one point to become the captain of a boat, but he returned to Illinois when that job "did not work out." (R. 26). Again, the ALJ never inquired about or discussed (though he briefly noted) Dunbar's attempt to take up a new job in a new state, what it involved, or why he felt compelled to give it up after

13

going to the trouble of earning a captain's license. Plaintiff's aborted work attempts all suggest that Dunbar experienced significant difficulties in sustaining full-time work. The ALJ did not have to accept anything that Dunbar said on these topics. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). But he did have to give good reasons for finding Dunbar's statements inconsistent with the record, which in turn obligated him to account for what Dunbar actually stated. *See Figved v. Colvin*, 103 F. Supp.3d 954, 961 (N.D. Ill. 2015).

As Dunbar's testimony suggests, his ability to work involved problems related to his memory and his anxiety impairment. The ALJ took some notice of these issues in one form or another. He recognized that Dunbar had been diagnosed with a panic disorder. The ALJ also took broad notice that "claimant testified to having problems with his memory" and could "no longer remember dates or numbers" – a fact dramatically illustrated at the hearing when Dunbar was unable to remember the day or month of his wife's death. (R. 22-23, 42-43). In addition, the ALJ noted that Dunbar's mental condition fluctuated "based on life circumstances and medication compliance." (R. 26). What the ALJ did not do, however, was to recognize or address the degree to which Dunbar claimed these issues were interlinked. By improperly accounting Dunbar's work history the ALJ fell short of explaining the links between "life circumstances" like work settings, uncertainty, memory, and panic that Dunbar clearly laid out. As noted above, Plaintiff told the ALJ that he goes "into panic mode" when he enters a new job setting. (R. 62). The ALJ did not cite any evidence that contradicted that claim, yet he also failed to explain how Dunbar would be able to sustain full-time work in light of it. Other examples could be cited. Dunbar made a related point in his written function report by again linking panic, memory, and unfamiliar situations. (R. 327, "I forget things. Don't understand things. I go into panic attacks. I get

14

lost inside stores"). Both Dunbar and his daughter stressed the link between forgetfulness or confusion and Dunbar's panic attacks. Dunbar stated that "I get confused. Then I'll panic if I feel I'm doing [something] wrong." (R. 331). His daughter confirmed that claim, stating "My father is very forgetful. I have to remind him of a lot of everyday things. Once he realizes that he forgot/messed up again, he gets really sensitive and that's one of the reasons he will get a panic attack or cry." (R. 262).

The ALJ never addressed any of this evidence that Dunbar becomes panicked and cannot remember things in situations – like work – where he is confused or unsure of himself. Dunbar and his daughter were quite specific on this issue, and their statements were central to the question of whether Dunbar could work full time. If the ALJ thought that their statements were inconsistent with the record, then he was obligated to address the matter head on and explain what evidence supported his conclusion that Dunbar did not experience debilitating panic and confusion in stressful situations like work. As it stands, the ALJ never inquired into what led Dunbar to leave his Florida job, misstated what Dunbar said he did for his brother, and overlooked Plaintiff's hearing testimony about becoming panicked in work settings. SSR 16-3p requires the ALJ to do so. *See* SSR 16-3p ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" including the "precipitating and aggravating factors"). An ALJ does not have to address everything in the record, *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015), but he must discuss everything that is relevant. Remand is therefore necessary so that the ALJ can account for this important evidence and build a logical bridge between the record and his analysis of Dunbar's statements.

2. **The RFC**

15

The ALJ found that Plaintiff could carry out medium work with various exertional and non-exertional limitations. The ALJ then added the following mental RFC: "He can perform simple and routine tasks. He can have occasional interaction with supervisors, coworkers and the public." (R. 23). The ALJ appears to have based the mental RFC on the assessments of non-examining state-agency experts Dr. M.W. DiFonso and Dr. Richard Hamersma. (R. 97, 116). These experts completed an MRFC1 form that found moderate restrictions in two areas of Dunbar's limitations concerning understanding and memory: (1) a moderate restriction in the ability to carry out detailed instructions, and (2) a moderate restriction in the capacity for maintaining attention and concentration for extended periods. (R. 95-96). They also found moderate restrictions in two areas of Dunbar's social functioning: (1) the ability to interact appropriately with the general public, and (2) the ability to "accept instructions and respond appropriately to criticism from supervisors." (R. 96). The ALJ gave great weight to both expert reports.

Dunbar challenges the ALJ's mental RFC assessment on two fronts. He first argues that the RFC finding that Dunbar can engage in simple and routine tasks fails to explain how the ALJ accounted for the moderate limitations that the state-agency doctors found in his cognitive functioning. This claim is another example of the nearly endless disputes that stem from the requirement that an RFC must incorporate all of a claimant's limitations that are reasonably supported by the record. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Generally speaking, merely stating in the RFC that a claimant is limited to "simple" tasks does not necessarily capture all of the mental limitations that a medical expert finds in a claimant's ability to carry out work. *Id.* at 620. Citing a familiar line of authorities explaining why that is the case, Dunbar argues that the ALJ's use of the phrase

"simple and routine" work falls afoul of this directive.

The Court disagrees. State-agency reports can have both worksheet entries in which the expert identifies a claimant's mental limitations in specific areas of functioning and narrative entries in which the expert can elaborate on his or her finding. An ALJ may rely on these narrative explanations for the mental RFC "where that narrative adequately encapsulates and translates those worksheet observations" that precede the narrative summary. *Varga*, 794 F.3d at 816. That is not always possible. As *Varga* stresses, the narrative summary must "adequately" account for the worksheet limitations in order for the ALJ to rely on the terms set out in the expert's narrative statement. *Id.* That is the case here. Dr. DiFonso's narrative section noted significant areas of the record concerning Dunbar's mental history and specifically stated that Dunbar's depression and anxiety "moderately limit [his] ability to manage detailed tasks." (R. 97). The state-agency experts further stated that despite these limitations Dunbar's cognitive skills permitted him to carry out "simple one-two step as well as semi skilled work tasks." (R. 97). Plaintiff does not explain why that does not adequately account for the specific limitations that Dr. DiFonso noted – moderate restrictions in the ability to carry out detailed instructions and maintain concentration for extended periods – or why the experts' narrative statements did not permit the ALJ to limit him to simple and routine tasks.

Dunbar's social functioning presents a different set of facts. The state-agency experts identified two limitations in Dunbar's social functioning in their worksheet findings: (1) his ability to interact appropriately with the public and (2) his ability "to accept instructions and respond appropriately to criticism from supervisors." Unlike their responses to Dunbar's cognitive functioning, Dr. DiFonso and Dr. Hamersma only included

17

a brief narrative statement on his social restrictions by stating "[i]nterpersonal skills are moderately limited by hx of panic attacks. Recommend moderate limit of social expectations." (R. 97, 116). The RFC tried to account for those findings by limiting Dunbar's interaction with supervisors, co-workers, and the public to "occasional" contact. Dunbar claims that the RFC's language of "occasional" contact with supervisors fails to account for all the limitations that the experts found in his social functioning. According to Dunbar, "occasional" contact addresses the *frequency* of his interactions with others, whereas the experts' concerns about his ability to accept criticism from supervisors goes to the nature of his interactions with supervisors. He also argues that the ALJ failed to account for the finding that he would have difficulty responding appropriately to criticism from supervisors.

The Commissioner has not responded to either of Dunbar's claims directly. That oversight waives the issue. *See Bonte*, 624 F.3d at 466. Even if it were not waived, the Court agrees with Plaintiff's reasoning. The government points to the experts' narrative statement that they "[r]ecommend moderate limit of social expectations." (R. 97, 116). Unlike the previous narrative summary, however, that does not address the specific limitations that the state-agency doctors found in Dunbar's social functioning. By limiting Dunbar to "occasional" contact with supervisors, the ALJ only addressed the amount of time that Plaintiff was required to spend with them. The ALJ never addressed how Dunbar was supposed to work on a sustained basis in light of his moderate limitation in responding appropriately to criticism. A claimant can have very limited contact with a supervisor and still respond so inappropriately to criticism that he cannot sustain full-time work. Remand is therefore required so that the ALJ can formulate an RFC that accounts for all the

limitations supported by the record.

## IV. Conclusion

Plaintiff Ronald Dunbar's Motion for Summary Judgment [23] is granted, and the Commissioner's Motion for Summary Judgment [30] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

ENTER:

_____
DANIEL G. MARTIN
United States Magistrate Judge

Dated: August 28, 2018